Statement of the Case.
MONROE, J.
Defendant has appealed from a verdict and judgment for $10,000 awarded plaintiff as damages for loss and injury sustained by her in consequence of the death of her husband. The circumstances connected with that occurrence, as disclosed by the evidence, were as follows:
On the afternoon of Sunday, June 19, 1910, Joseph Gibson, plaintiff’s husband, being in defendants’ employ as train conductor, was bringing a train consisting of an engine and tender, two steel gondolas, loaded with coal, four other freight cars, and a Pullman coach, to New Orleans from Shrewsbury. He was himself running the engine, which was a “six-wheeled connected switch engine,” intended to be run not over 15 miles an hour, and so constructed that, if speeded beyond that limit, it was likely to “buck,” and leave the track; that is to say, the greater part of the weight resting upon the middle parv of wheels, the ends were likely to bounce up and down, or, if there was a train attached to, and holding down, the rear end, the front end was likely to bounce, up, and, upon entering a curve in the track, the front wheel on the outside was likely to come down with the flange upon the ball, or top, of the rail, and, there being no trucks and the tendency of the engine being to continue in a straight line, its derailment would ordinarily follow. And, so it happened in this instance; the engine having kept the rails until it reached a point in the parish of Jefferson, a few feet to the southward of the Metairie road, where the track curved slightly to the right, when the left front wheel mounted the rail, and, after, running in that way for a short distance, went off to the left, bringing both wheels down upon the cross-ties, the one upon the outside of the left rail, and the other between the rails, and, still proceeding, the engine went further to the left, until the front wheel on that side or, perhaps, both wheels, plowing into the ground and bringing the bottom of the engine in contact with the surface, the roadbed was torn up and the ties cut and mashed, until, the resistance in front being great, the rear end of the engine was pushed around by the momentum of the cars behind it, and its position reversed, and it was then overturned on the left side of the track, whilst the tender and the gondola next to it were forced off, or partly off, the track, on the right side, beyond the engine, and so tilted as to spill a portion of the contents of the gondola; Gib *13 son being killed in the overturning of the engine.
Dr. Gelbke, coroner of the parish of Jefferson, was summoned, and as Mr. O. M. Babcock, division master mechanic of the Texas & Pacific Railroad Company, happened to be with him when he received the summons, and off duty, it being Sunday, they both went to the scene immediately, and examined the surroundings with a view of determining the cause of the accident. Mr. Guy Hopkins, operating engineer of the Southern Pacific Company, was taking an afternoon drive, and came to the place very soon after the accident had happened, and, he,'too, made an examination as a matter of professional interest. Prom the testimony of these and other witnesses it is conclusively established that up to the point at which the front wheels of the engine went entirely off the rails the track was in good condition, with no spreading of the rails, and not a spike drawn, and the weight of the testimony, as we think, sustains the view that the cross-ties supported the engine even after the front wheels had left the rails, and until the left front wheel or both of them went off the ends of the ties into the ground, thereby bringing the body of the engine in contact with the surface of the roadbed, from which time the roadbed and ties were badly torn and broken up.
Mr. Babcock, having Qualified as an expert in such matters, was asked:
“Well, Mr. Babcock, kindly state to the jury what, in your opinion, caused that engine to be in that position, in which you see it now, according to that photograph? [The photograph referred to being one which had been taken by a newspaper reporter within probably an hour or so after the accident, and which represents the engine in the position in which the witness himself had seen it.] A. Excessive x'unning for that design of engine; an excessive rate of speed. * * * Well, I would consider anything over 15 miles an hour to be an excessive rate of speed. * * * If that was in a straight line, along a straight piece of track, the engine might have kept going, but there is a curve in the track, and just beyond the crossing a little ways, though I didn’t measure it exactly to find out what it was, there is a frog. Well, the excessive rate of speed started that engine to buck, and the extra weight behind raised the front drivers clear off the rail, and, when she came down on the flange, on that left-hand side going to New Orleans, it came down in a straight line on top of the rail, and the weight of the engine left that scar [referring to a scar on the rail, to which he and several other witnesses testified], and the engine continued to travel in a straight line until the time she left the ties. Then the momentum of the train shoved her around and headed her in the opposite direction. * * * There is no truck as would be the case with a road engine, and it would travel in a straight line, and, when it comes down, then, the flange necessarily comes down on the ball of the rail [meaning, as he explains, the top of the rail].”
Mr. Hopkins testifies: That he was as an operating engineer interested in finding out what was the cause of the wreck. That he found where the wheels had first struck the ties, and followed the marks until they disappeared from the ties. That the track was in good condition.
“There was no sign of a wreck until the engine was completely off the track. * * * The moment she got off the ties, she tore them up. * * * If the engine had stopped before she got off the ties, it could have been jacked up, but the moment she got down to the soft dirt, alongside of the ties, that was a different proposition. The moment the lowest part of the engine hits- the dirt then she tears everything up. * * * I will give you my theory of that wreck, if you want, in a general way., * * * Well, my idea is that she left there on a tangent point. * * * When the front wheels got off the rails and into the sand, it offered a very heavy resistance. * * * The weight of the train pushed the engine completely around, dropping her in the ditch.' * * *
“Q. Does that indicate great momentum? A. I would place that at a very high rate of speed; yes, sir. * * * Q. What was the cause of this wreck in your opinion? A. First of all, you will have to admit that there are no defective parts of the engine. You will have to assume that the rolling stock and everything else was in first-class shape and equipment. Q. Yes; assuming that the engine was not defective, and taking the road as you saw it. A. Then it was a question of speed.”
There is uncontradieted testimony to the effect that the engine was in good order, and the theory of the experts, that the accident *15 was attributable to excessive speed, finds support in tbe testimony of the fireman, who estimates the speed at from 15 to 25 miles an hour; and by that of Walter Hanford, who says that he was fishing near by, and that, as he had previously caught the train and returned to the city on it, he concluded to do so again, and, with that view, ran down to the track, “but” (to quote his language), “when I got there, she was going along much faster. I tried to catch it, and the next thing I knew she was in the ditch.” He further testifies that he has been a fireman on locomotives, and has had experience in getting on and off moving trains, and that he estimates the speed of the train in question at 25 or 30 miles an hour.
It is shown that after the accident it was found that the throttle valve of the engine was wide open, and that the brakes had never been applied. It was also shown that, whilst the throttle might possibly have been opened by the turning over of the engine, that movement would not have affected the brake handle. It is further shown that no attempt had been made to use the reverse lever.
The engineer, who was called as a witness for plaintiff, testifies that he had examined the engine before going out on the trip, and tnat he had been going over the track twice a day, and had found it in apparent good order; that at the time of the accident the engine was running at the rate of 12 or 14 miles an hour; that they were allowed to go at the rate of 15 miles an hour; that Gibson was at the throttle; that it was not his place to be there, and that there were other places on the train where he might have been; that he does not know why the engine turned over. He gives his theory of the accident as follows:
“The engine was headed for the city of New Orleans and the engine part of the tank parted from the tank. Probably, a drawbar broke or one of the king pins, and the engine parted, and she made a lunge towards the woods, which, naturally, threw the front drivers and the back drivers off the rails, and left the weight of the engine about the center or on the main drivers, which sort of balanced her, and the momentum of the speed reversed her, and naturally she turned over. That is what I think about it.”
He further testifies that Gibson was running tbe engine as he would have done, was running it properly, and under his (witness’) immediate control.
Max Fisher, who was working in a pasture in the neighborhood, testifies that the speed of the train was about eight or nine miles an hour.
Charles Adams, who was working about a square and a half away, says that it was not going fast; and several other witnesses give testimony the purpose of which appears to have been to show that the ties in that portion of the track with which the wheels and body of the engine came in contact were rotten, and that certain ties which were produced at the trial were fair specimens of them. The testimony is inconclusive, because, as to the condition of the ties, as seen at the time, it is contradicted by that of the coroner, who made a minute examination as a matter of official duty, and by that of Messrs. Babcock and Hopkins, who made examinations because of their professional interest in the matter, whilst the other witnesses made no examinations at all, but testified merely from casual observation. Moreover, whilst some of the witnesses referred to indulge in wholesale condemnation, others are more conservative, and say that some ties were good and some bad. Thus Mr. Beavais testifies in part as follows:
“The track seemed to be all right, but there were some few rotten ties in it. * * * You can find rotten ties in any railroad. * * * Well, you see they were split up so much that you could not fell a sound tie from a rotten tie. They were mixed up so that you couldn’t tell the difference. Most of them were cut in three pieces.”
*17 He further testifies that some of the ties that were taken or left out when the road was repaired were put into Rohli’s yard; that others that were not cut too badly were replaced in the road, but that the majority of them were burned. What proportion of the whole number of ties which were thrown out were given to Rohli, and what proportion of the number given to him were left when the ties produced in court were selected, is uncertain.
The track foreman testifies that they had completed the overhauling of that part of the road December 30th preceding the accident, and had then taken out the defective ties, and given them to the people in the neighborhood, or burned them. He also called attention to the fact that one of the ties produced in court had no wheel mark on it. It may be therefore that some of the ties in Rohli’s yard had been collected by him before the accident, and it would seem reasonable to suppose that those which were left ten months after the accident were only such as were found to be too rotten to be used for firewood or other purposes.
Opinion.
[1] The duty of a train conductor may at times, require him to ride in the cab of the engine, and, if the engineer should suddenly lose his mind, fall dead, or be stricken with paralysis, it might become the duty of the conductor to take his place for the moment, and stop or operate the engine, but the evidence in this case fails to show any reason whatever for the presence of the conductor in the cab, and still less for his undertaking to run the engine, since the engineer was there in the cab ready and competent to discharge that responsible function himself, and his testimony in regard to the presence of the conductor (being the only testimony in the record on that subject) runs as follows (on cross-examination by counsel for defendant):
“Q. Now, Mr. Calongne, as a fact, who was driving the engine at the time the accident happened? A. You mean who was at the throttle? Q. Yes; who was at the throttle at the time the accident occurred? A. Mr. Gibson was. Q. Did he have any right to be at that throttle; was that his position, in other words? A. No, sir; it was not. Q. Was he employed as the engineer of the train? A. No, sir; I was the engineer of the train, and he was the conductor. Q. Were there other places on the train where Mr. Gibson could have been, except in the cab, or other than in the cab? A. Yes, sir. By Mr. Forman (counsel for plaintiff): Q. You were right beside Mr. Gibson in the cab? A. Yes, sir. Q. At the time that he had his hand on the throttle, as you say, did he do anything whilst standing at the throttle that you would not have done? [Objection and ruling.] A. No, sir; he was running the engine just as I would have run it. * * * Q. Was he running the engine properly? A. Yes, sir; running it under my immediate control. * * Q. You were right there by him while he was running it? A. Yes, sir. Q. And he couldn’t have done anything without your seeing him do it? A. No, sir. * * * Q. You were looking at him while he was there? A. Yes, sir. * * * Q. Will you kindly state whether or not the foreman of a train crew is in the habit of riding anywhere about the train that he sees fit to ride, sometimes on the front board, sometimes in the cab, and sometimes on one of the cars? A. Well, I haven’t got to that point exactly. That is something that I don’t know, as to what he has a right to do; but I have seen foremen ride in the cabs before. Now, whether that is permissible or not * * * I can’t answer that question exactly. * * * I have seen foremen ride.in all parts of the trains.”
[2] There is no evidence tending to show that the decedent was competent to run an engine, or that he had ever attempted to do so before; nor, though the engineer testified in general terms that decedent was running the engine upon the occasion in question as he (the engineer) would have done, he does not say, and was not asked, whether at any time after the engine mounted the rail the decédent shut off steam, reversed the lever, or applied the brakes, and it is shown, with reasonable certainty, that he did neither. We cannot as the case is presented escape the impression that, if the engineer himself had been at the throttle, he would have felt instantly the mounting of the rail by the engine, and, whilst it was running the 150 or 175 feet between that *19 point and the point at which it was overturned, would have made use of some, or all, of the means of stopping it to which we have just referred. Whether his effort as the train was being run would have been successful no one can say. On the other hand, in view of the testimony of the fireman, of the witness Hanford, and of the two disinterested experts, considered in connection with the fact that, after the engine (which is. said to have weighed about 65 tons) had left the ties and its body had been let down upon the roadbed, with one fore wheel, at least, buried in the earth to the' left of the track, it was driven forward for say 100 feet, completely turned around, and then overturned, we find it difficult to believe that it was being run within 15 miles an hour, or as the engineer would run it. Beyond that, conceding that a conductor may, in the discharge of his duty and under given circumstances, ride in the cab of the engine, we take it that, inasmuch as the man holding the certificate, or license, of an engineer, was employed to take charge of the engine, and as some one is needed to see to the general movement of the train, the condition of the different cars of which it is composed, the behavior of the train crew, and the safety of the passengers, the circumstances relied on as showing that in this instance the conductor was riding in the cab of the engine in the discharge of his duty should have been made to appear by the evidence; and, as that has not been done, our conclusion is that the deceased conductor, at the moment of the accident, was not occupying a position for which he was employed. But, even assuming that his riding in the cab was proper, it was certainly no part of his duty to substitute himself in place of the engineer any more than it would have been to have substituted any other person not holding an engineer’s certificate, and hence incompetent to undertake the discharge of an engineer’s duty, and the defendant cannot be held responsible for the consequences to him of his thus doing a thing which his duty to it did not call for but forbade. If, however, it had been shown that the engineer was at the throttle and the conductor at some other place upon the train, the evidence would not warrant a judgment for plaintiff, since it shows that the engine was in good order, and that the road up to and for some distance beyond the point at which it mounted, and then left, the. rails, was also in good order, and the principal effort of the plaintiff has been to prove that the ties in that portion of the road which was torn up after the engine had left the rails, and after, at least, the left fore wheel had left the ties, were rotten, and we do not find that the effort has been successful; the preponderance of the evidence satisfying us that, though there were rotten, or partly rotten, ties in that stretch of the road, there were not enough of them to render the road' unsafe, and that they did not contribute to the accident, since, after the body of the engine had been let down upon the roadbed, the condition of the ties that were thereafter torn and cut up was immaterial to the ultimate result.
It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be set aside and reversed, and that there now be judgment for defendant, rejecting plaintiff’s demand, and dismissing this suit at her cost.